Argued and submitted October 5, 1983, judgment of Court of Appeals modified and case remanded June 26, petition for rehearing denied July 31, 1984

## STATE OF OREGON,
*Petitioner on Review,*

*v.*

## ALLEN G. WHITE,
*Respondent on Review.*

(TC 81-9-102; CA A23660; SC 29082)

685 P2d 983

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the briefs were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Marilyn C. McManus, Salem, argued the cause for respondent on review. With her on the brief was Gary D. Babcock, Public Defender, Salem.

LENT, J.

Campbell, J., dissented and filed opinion.

**LENT, J.**

The key issue is whether certain inculpatory statements made by the defendant stemmed from custodial interrogation as that term was defined by the Supreme Court of the United States in *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed2d 694 (1966). That court said:

> "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

384 US at 444. A subsidiary issue is whether evidence seized in a search subsequent to defendant's inculpatory statements must be suppressed.

The facts we state are either undisputed or are binding upon us because they are taken from those found by the trial court in deciding defendant's motion to suppress his statements and the real evidence. *See, e.g., State v. Warner,* 284 Or 147, 585 P2d 681 (1978).

A farm building was burglarized on August 28, and eggs, milk and a radio were taken. Near midnight an informant telephoned to the Hermiston police, and a policeman named Duke came to interview the informant. The informant told Duke that defendant had come to the informant's home about an hour earlier and given the informant eggs and milk.[1] The containers had the farm name on them. The informant recounted that the defendant told the informant that the defendant had taken the milk and eggs from the farm because the farm owner had refused to pay defendant wages for labor at the farm. The informant told Duke where defendant and his family were camping.

At about 4 a.m. on August 29, Duke, Umatilla Policeman Storment and Oregon State Trooper Christensen arrived at the campsite to contact defendant about the burglary and to contact one Perkins, reportedly staying at defendant's campsite, about another burglary and an attempted murder. The officers had a warrant for the arrest of Perkins.

---

[1] The informant and defendant were at least acquaintances, if not friends, prior to this incident.

Concerning the officers' intent with respect to arresting defendant, Duke testified:

"Q   Were you prepared to arrest him at the time you went out there?

"A   Yes, we were.

"Q   Was that dependent upon what you found out, or were you simply going to arrest him if you found him?

"A   I don't understand.

"Q   Were you simply going to go out and arrest him?

"A   Yes, him, first we were.

"Q   Had you made up your mind to arrest him?

"A   Not thoroughly, no."

When the officers arrived, defendant, his wife and his children were asleep in the tent. During the ten minutes immediately after arrival at the campsite, Duke unsuccessfully looked around in the bushes near defendant's tent for Perkins.

Meanwhile, the other officers by words[2] awakened defendant, who came just outside the tent. They asked him if he had gone to the farm and taken the eggs and milk, and he responded that he had. They asked why he had done so, and he answered that his family was hungry and that the farm owner had not paid defendant his wages for farm work.

Duke testified that when he had completed his ten-minute search of the area for Perkins, he returned to the place where Storment and Christensen were talking to defendant. Duke testified that he heard Storment, "pursuant to

---

[2] Duke was the only officer called as a witness by the prosecution at the evidentiary hearing on the motion to suppress. He was not asked to testify to the words used to bring defendant out of the tent. Defendant testified:

"They came out and they woke me up and told me to come out of the tent; so I came out * * *.

"* * * * *

"No, 'cause I was 'aside the tent. He told me to come out of the tent. He, this is the police.

"* * * * *

"They said, 'Allen White, this is the police. Come out of the tent, please, we'd like to talk to you.'"

Miranda," advise defendant of his rights, that defendant "indicated" that he understood his rights and that thereafter defendant made the inculpatory statements about taking the property from the farm. Defendant testified that the questions were asked and his answers given before he was advised of his rights.

Duke testified that after the inculpatory answers were given, Storment asked defendant if they could look in defendant's car, that defendant answered that they could do so and told them where the "items" were. Duke then opened the car and found eggs and the radio where defendant said they were.

At the conclusion of the hearing on the motion to suppress, the trial judge stated from the bench:

> "And, therefore, in view of the fact that he [defendant] was the center of the attention, he was a strong suspect, and he [Duke] had somewhat of an intention to arrest him when he went out there, the Miranda warning should have been given before he discussed the allegations of theft whether or not for 10 minutes."

The judge allowed the motion to suppress the inculpatory statements.[3] He noted that the evidence was uncontradicted that defendant gave his "personal consent" to the search of the car and denied the motion to suppress the evidence found

---

[3] This ruling was prior to either of this court's decisions in *State v. Roberti,* 293 Or 236, 646 P2d 1341 (1982), and 293 Or 59, 644 P2d 1104 (1982). In this opinion we shall call the earlier decision the "initial" decision. The initial decision was by a court divided four to three and held that the defendant's inculpatory statement made to a police officer was admissible because the interrogation that produced the statement was not custodial. There were two separate dissenting opinions. Upon petition for rehearing, one member of the majority in the initial decision decided to support the dissenters' position, with the result that the original dissent authored by Judge Lent became the majority decision of the court. We shall call that decision the "final" decision, and when we refer herein to the majority decision in *Roberti,* unless stated otherwise, we have reference to the opinion authored by Judge Lent.

In the final decision we said:

"In the case at bar, at least as early as the time the officer decided to arrest the defendant, the focus of the process was on the defendant, and the officer's purpose was to elicit an admission. The [initial] majority [of this court] treats the famous footnote 4 of *Miranda* as superseding *Escobedo.* Actually, footnote 4 says the two concepts mean the same thing."

Footnote 6, 293 Or at 89, 644 P2d at 1122. Our final decision was not predicated, however, on equating the "focal suspect" concept with "custodial interrogation."

in the car. Later the court made and entered an order in conformance with those rulings.

The state did not appeal prior to trial, as it might have under ORS 138.060(3), from the order suppressing the statements. Upon jury trial the defendant was found guilty, and judgment of conviction was entered.

Defendant appealed, assigning denial of his motion to suppress the items seized from the car. In the Court of Appeals the state virtually conceded that the items should have been suppressed if the trial court was correct in its ruling on the suppression of the statements. The state argued, however, that the trial court did not err in denying suppression of the items because the trial court did err in holding that the statements were to be suppressed. The state argued that the interrogation was not custodial and that the trial judge had mistakenly applied the pre-Miranda "focal suspect" test from *Escobedo v. Illinois,* 378 US 478, 84 S Ct 1758, 12 L Ed2d 977 (1964).[4]

The Court of Appeals stated that the facts here permitted no other conclusion than that defendant was "in fact, under arrest" at the time he made the inculpatory statements and, therefore, the statements were properly suppressed under the final decision of this court in *State v. Roberti,* 293 Or 236, 646 P2d 1341 (1982), *petition for cert filed.*[5] Having held that the trial court did not err in suppressing the statements, the Court of Appeals held that the items seized in the search of the car should have been suppressed and reversed.

---

[4] Upon oral argument in this court, the issue was raised by the Chief Justice whether, having not appealed, the state could so challenge the trial court's order suppressing the statements. It is not a question of jurisdiction; the Court of Appeals had, and this court has, jurisdiction of the case by reason of the defendant's appeal. The issue is one of the procedural law of appeal and error. Because the state unequivocally made the alleged error an issue on appeal and in this court, we shall address it. *Cf, Artman v. Ray,* 263 Or 529, 501 P2d 63, 502 P2d 1376 (1972).

[5] In our initial decision in *State v. Roberti,* 293 Or 59, 644 P2d 1104 (1982), we held that a police officer's present but uncommunicated intent to arrest a stopped traffic offense suspect did not require the giving of *Miranda* warnings. Upon petition for rehearing, we adopted the views of the judges who had dissented in the original decision. *State v. Roberti,* 293 Or 236, 646 P2d 1341 (1982), *petition for cert filed. See* footnote 3, *supra.*

We allowed the state's petition for review to determine whether our final decision in *State v. Roberti, supra,* was properly applied by the Court of Appeals to this case.[6]

This case presents a clear case of interrogation by the police officers. The only issue is whether it was custodial interrogation as defined in *Miranda.*

Analysis does not begin with fixing the time of "arrest." The definition of custodial interrogation given in *Miranda* cannot depend upon the concept of "arrest" as such, for if it did, the various states, by diverse definitions, could fix varying meanings to the Due Process clause as it encompasses the self incrimination clause of the Fifth Amendment to the Constitution of the United States. Although in Oregon[7] "arrest" as defined in ORS 133.005 will ordinarily subsume custody, the obverse is not necessarily true.

Analysis must begin with determining whether the person being questioned is in custody. If he is, he must be warned prior to putting the questions in order to enable the government to use his statements against him. If he is not in custody, it still remains, by definition, to determine whether he is "otherwise deprived of his freedom of action in any significant way." If he is, a predicate for using his answers to interrogation against him is the giving of the warnings prior to putting the question. If he is not so deprived, warnings are not a predicate for governmental use of his answers against him.

In the final decision in *Roberti,* when a majority of this court decided that a statement of the defendant should have been suppressed because it was made pursuant to custodial interrogation, that majority did not evince complete agreement as to the exact point in the sequence of events that

---

[6] Not until after this court had allowed the petition for review did the defendant make a contention that this case should be decided under Article I, section 12, of the Oregon Constitution rather than under the Due Process clause of the Fourteenth Amendment to the Constitution of the United States. In the circumstances we do not feel constrained to analyze the case under the Oregon Constitution before passing to the Due Process clause. *Compare, State v. Kennedy,* 295 Or 260, 666 P2d 1316 (1983).

[7] ORS 133.005 defines "arrest," but only for the purposes of certain enumerated sections of Oregon Revised Statutes. Interestingly enough, ORS 133.005 defines "arrest" as used in ORS 131.655, a section which is concerned with detention and interrogation of persons suspected of theft committed in a store, but the text of ORS 131.655 does not contain the word "arrest."

custodial interrogation commenced. The final majority members of the court agreed that

> "at least as early as the time when the officer had arrived at a decision, although uncommunicated to the motorist, to arrest him"

interrogation thereafter was custodial. 293 Or at 76. The final majority held that the injunction of the *Miranda* decision was directed to the questioning officer, not to the person being questioned and, consequently, it was the officer's realization that the person was not free to go that was important, not a realization by the questioned person that he was not free to leave. The final majority also noted:

> "It defies common sense to suggest that in those circumstances a reasonable person would believe anything other than that he was not free to leave.
>
> "* * * Immediately prior to the time the question was asked, a reasonable person in the same circumstances would have believed he was not free to leave, and this defendant was, *in fact,* not free to leave by reason of the officer's decision to prevent defendant's leaving. I would hold that the question was, therefore, custodial interrogation * * *." (Original emphasis.)

293 Or at 90-91, 644 P2d 1123.

One member of the final majority, Judge Linde, in dissenting in the initial decision, drew particular attention to the proposition that judicial decisions should afford to the police officer guidelines that tell him how he is to comport himself in the field investigating crime. 293 Or at 91, 644 P2d at 1123. He pointed out that it is the factual setting, not later legal analysis, that is important to the officer in deciding when the warnings are to be given. He posed a simple workable rule:

> "Seen from the perspective of an officer who must decide whether to warn before questioning, a person will clearly be deprived of his freedom of action under two circumstances. An officer who knows that he would not let a detained person leave at will also knows that the person has lost his freedom of action, whatever the person's own perception may be. Second, apart from intent, an officer can determine whether the objective circumstances under which he detains a person in fact lead the person reasonably to believe that he or she is not free to leave until the officer is satisfied. Both of these are manageable, common sense, factual determinations. If an

officer does not mean to deprive the addressee of his questions of freedom to leave at will, he can easily tell the person so."

293 Or at 92, 644 P2d at 1124.[8]

■ We now hold that interrogation is custodial under *Miranda* if the police officer actually knows that he would not let the person being questioned leave or if the officer should be aware that the totality of circumstances in which the interrogation takes place is such that the person questioned would reasonably believe he is not free to leave.

■ Whether either test was met in this case was a question of historical fact to be determined by the court trying the issue of suppression. We cannot fairly say that the trial court found either way on either test on the trial of the motion to suppress in this case.[9] Hearing on the motion has been held, however, and the case can be remanded to the trial court to make the requisite finding of historical fact on the evidence, which has been preserved. If, upon review of that evidence, the trial court finds that the officers knew that they would not have let the defendant leave without answering their questions, or if the court finds that the officers should have been aware that the totality of the circumstances was such that defendant would have reasonably believed that he was not free to leave, the trial court's original ruling that the statements should be suppressed must stand.

If that ruling must stand, the further evidence seized in the search of the car must also be suppressed, and defendant is entitled to a new trial.

---

[8] Although seizure of a person in the constitutional sense of the Fourth Amendment to the Constitution of the United States may not, for all purposes, be equivalent to depriving a person of his freedom of action in *any* significant way, it is interesting that after our decision in *Roberti* the Supreme Court of the United States seems to have held that a person has been seized in the constitutional sense if a reasonable person in all the circumstances would have believed he was not free to leave. *Florida v. Royer*, 460 US 491, 103 S Ct 1319, 75 L Ed2d 229 (1983).

[9] The case of *Orozco v. Texas*, 394 US 324, 89 S Ct 1095, 22 L Ed2d 311 (1969), is almost squarely in point. There, defendant had been involved in a quarrel shortly after midnight. A shot was fired, killing a man. Defendant left the scene. About four hours later, four police officers came to defendant's bedroom in a boarding house and began to question him. No warnings were given of defendant's right to remain silent, and his inculpatory answers to the questions were received in evidence over his objection under the Due Process clause. The conviction was reversed. In *Orozco*, as in *State v. Roberti, supra*, the officers testified that the defendant would not have been allowed to leave. There is no such direct testimony in the case at bar.

The decision of the Court of Appeals is modified, and the case is remanded to the trial court for further proceedings conforming to this opinion.

**CAMPBELL, J.**

I dissent in this case for the reasons given by Justice Tanzer in the majority opinion in *State v. Roberti,* 293 Or 59, 644 P2d 1104 (1982). Justice Tanzer's majority opinion later turned out to be the dissenting opinion in this court's final decision. *State v. Roberti,* 293 Or 236, 646 P2d 1341 (1982).