# STATE OF OREGON,
### *Respondent,*

*v.*

# ELBERT HACKWORTH,
### *Appellant.*

### (8301-0210; CA A30048)

685 P2d 480

F. James Healy, Albany, argued the cause for appellant. With him on the brief was Long, Delapoer, Koos & Healy, P.C., Albany.

Linda DeVries, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Defendant appeals a conviction for driving under the influence of intoxicants, ORS 487.540, alleging that the trial court erred in failing to suppress certain statements defendant made before he was given *Miranda* warnings. We affirm.

We are bound by the historical facts found by the trial court in the omnibus hearing. *Ball v. Gladden*, 250 Or 485, 443 P2d 621 (1968). At approximately 4:15 a.m., Lane County Deputy Sheriff Benson was dispatched to the scene of a single-car accident. He found a pickup truck in a field next to the road and saw that defendant was attempting to drive it away but was apparently stuck in the mud. Observing that defendant had a cut on his forehead, Benson told him to stay there while he went to his patrol car for his first aid kit. Benson then put a dressing on defendant's wound while defendant leaned on the front fender of his truck. While attending to defendant, Benson detected a strong odor of alcohol on his breath and person and noticed that his eyes were watery and bloodshot, his words were slurred and he was unsteady on his feet. He asked defendant how the accident happened. Defendant said that he was driving home to Sweet Home when the lights of his pickup went out and he went off the road. Benson asked if he had been drinking, and defendant replied that he had had several beers and some shots of vodka. Benson asked him for his driver's license, and defendant had trouble retrieving it from his wallet. In response to Benson's questions, defendant stated that he was the truck's only occupant and had been driving at the time of the accident and that he did not believe his unstable condition was a result of the accident. Benson asked him what time it was and where he was, and defendant thought it was an hour earlier than it was and that he was near Tangent, which in fact was 24 miles away. Defendant refused Benson's request to take roadside sobriety tests. After defendant answered negatively inquiries about whether he was taking medication or had had any alcohol after the accident, Benson arrested him for driving under the influence of intoxicants and advised him of his rights. Approximately 15 minutes elapsed between the time Benson arrived at the accident scene and the formal arrest.

At trial and on appeal defendant did not argue that the evidence should be suppressed under the state

constitution. Citing the test of "custodial interrogation" expressed in *Miranda v. Arizona,* 384 US 436, 444, 86 S Ct 1602, 16 L Ed 2d 694 (1966), as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," defendant contends that he should have been advised of his rights when, "while administering first aid, Benson made his observations which prompted him to question the defendant on the defendant's sobriety." We understand him to argue, first, that it was at that point that Benson determined to arrest defendant and, second, that the evidence demonstrates that a reasonable person would not have felt free to leave at that point and that he was therefore deprived of his freedom in a significant way. The trial court found that Benson did not decide to arrest defendant until after he had declined the sobriety test and had stated that he had consumed no alcohol after the accident. The court refused to suppress statements made before that point. A recent United States Supreme Court case, *Berkemer v. McCarty,* 468 US ___, 104 S Ct 3138, 82 L Ed 2d 317 (1984), undermines both of defendant's arguments and the articulated basis of the trial court's decision.

Previous Oregon decisions based on federal law have indicated that a person is entitled to *Miranda* warnings at least when the inquiring officer had made a decision to arrest the suspect, whether or not that intention was communicated. *State v. White,* 297 Or 302, 685 P2d 983 (1984); *see also State v. Roberti,* 293 Or 236, 646 P2d 1341 (1982), *remanded* 468 US ___ (1984).

In *Berkemer v. McCarty, supra,* the Supreme Court disapproved such a test, stating:

> "* * * A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. * * *" 468 US at ___, 104 S Ct at 3152.

In addition, the Court further clarified the test enunciated in *Miranda,* indicating that a person is not entitled to be advised of his rights if he is not "subjected to restraints comparable to those associated with a formal arrest." 468 US at ___, 104 S Ct at 3152. Thus, our inquiry in this case is not to determine

when Benson formed the subjective intent to arrest defendant, but rather to determine at what point a reasonable person in defendant's situation would have understood himself to be in custody or under restraints comparable to those associated with a formal arrest.

As demonstrated by the facts in that case, *McCarty* also clarifies that that inquiry differs from the inquiry whether defendant felt "free to leave." In *McCarty,* the officer observed the defendant's car weaving on the highway and stopped him. He noticed that the defendant had difficulty standing and decided to charge him with a traffic offense, but did not communicate that intention to the defendant. He questioned the defendant about his use of intoxicants and asked him to perform a "balancing test." The Supreme Court concluded that the defendant's responses were admissible, despite the fact that he had not been given *Miranda* warnings. The Court noted that a driver's freedom of action is significantly curtailed in a traffic stop — at least in part because it is usually illegal to elude an officer, *see* ORS 487.555 — but concluded that other features of the "ordinary traffic stop" offset the effect of that curtailment.

> "Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely,' *Miranda v. Arizona,* 384 U. S., at 467. First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. In this respect, questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek. See *id.,* at 451.

> "Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee

to respond to questions. But other aspects of the situation substantially offset these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. In short, the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself, see 384 U. S., at 445, 491-498, and in the subsequent cases in which we have applied *Miranda*." *Berkemer v. McCarty, supra,* 468 US at ____, 104 S Ct at 3149-50. (Footnotes omitted.)

This reasoning makes clear that the fact that a motorist may temporarily feel that he is not "free to leave" does not render him "in custody" for purposes of *Miranda*.

■ ■    We thus consider whether, under the standards expressed in *McCarty,* defendant was entitled to *Miranda* warnings before he was formally arrested. This case involves an accident investigation rather than a traffic stop, and thus some of the factors for determining the "atmosphere" vary from those the Court discussed in *McCarty*. Our conclusion is the same, however; the circumstances of this encounter did not trigger the requirement of *Miranda* warnings. First, defendant was not pulled over by the officer; he was already detained by the accident itself. Benson testified that defendant would not have been free to leave until he had completed his accident investigation. Assuming a reasonable person in defendant's position would have been aware of that unarticulated intent, such detention—like the traffic stop in *McCarty*—does not rise to the level of the "functional equivalent of formal arrest." *Berkemer v. McCarty, supra,* 468 US ____, 104 S Ct at 3152.[1] Had defendant not been arrested, any

---

[1] Defendant stresses that Benson never returned his driver's license and that he was therefore not free to leave. *See State v. Bozgoz,* 67 Or App 761, 679 P2d 1377 (1984). (We do not here express an opinion to what extent *Bozgoz* survives *McCarty*.) As the state points out, there is no evidence of such a fact in the record of the omnibus hearing. Benson's somewhat unclear testimony was, "I obtained a license from him and gave him his wallet back." If at trial there was evidence that the license was kept,

restraint would have been temporary. A motorist questioned at an accident scene, especially when there is no serious injury, reasonably expects that he will have to answer some questions and have his license and registration checked and that shortly he or the officer will depart. Like the traffic stop discussed in *McCarty,* the accident investigation took place in public and involved an encounter with only one officer.

We conclude that the trial court did not err in refusing to suppress statements by defendant made before he was formally arrested.

Affirmed.

---

we cannot consider it in reviewing the court's ruling in the omnibus hearing. *See State v. Fields,* 51 Or App 125, 624 P2d 655 (1981), *rev'd on other grounds,* 291 Or 872, 635 P2d 376 (1981).