Argued and submitted February 15, reversed and remanded for trial October 16, 1985

# STATE OF OREGON,
### *Appellant,*

*v.*

# ARTHUR LEROY WANDLE,
### *Respondent.*

## (35849; CA A32153)

707 P2d 1281

Brenda J. Peterson, Assistant Attorney General, Salem, argued the cause for appellant. With her on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Martin E. Hansen, Bend, argued the cause for respondent. With him on the brief was Johnson, Marceau, Karnopp & Petersen, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

Buttler, P. J., dissenting.

**ROSSMAN, J.**

In this negligent homicide case, the state appeals a pretrial ruling which held that defendant was in "custody" and suppressed statements he made to police because he had not been given *Miranda* warnings. Because we conclude that defendant was not in custody, we reverse.

Defendant, a long haul truck driver, was charged with two counts of negligent homicide in connection with a motor vehicle collision which occurred in the early hours of August 19, 1983. Defendant was traveling east on Highway 20 about 47 miles east of Bend when his headlights malfunctioned. He was subsequently rear-ended by another vehicle in the traveled portion of the eastbound lane. Both occupants of the other vehicle were killed. During the course of the accident investigation, defendant made incriminating statements. He moved to suppress the statements under *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). The trial court allowed the motion.

■ The decisive issue is whether defendant was in "custody" when he gave the incriminating statements. The trial court made specific findings and concluded that he was. We must accept the court's findings of historical fact if there is evidence to support them. We resolve conflicts regarding the historical facts in the manner supporting the trial court's ultimate conclusions. However, whether the historical facts are legally sufficient to support the ultimate conclusions is a legal question which falls within our scope of review. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968).

The pertinent trial court findings, as supplemented by additional undisputed facts, are as follows: The accident occurred in the desert, miles from the nearest community. The first officer on the scene, Hodson, arrived about 45 minutes after the collision. During questioning, defendant told Hodson that, after his headlights failed, he had continued to drive slowly with his warning lights on. Thereafter, Hodson observed that the truck was leaking oil and diesel fuel, which was collecting on the ground. He also noticed that there was another spill site before the point of impact, apparently indicating that the truck had, in fact, been stopped before the collision. He mentioned his observation to defendant.

Sometime later, Sgt. Searcey arrived, talked to Hodson and observed the multiple spill sites. He talked with defendant regarding the collision and told him that his story was at odds with the physical evidence observed at the scene. Because of the discrepancies between defendant's statements and the physical evidence, Searcey decided to call in an accident reconstruction expert. He also ordered defendant's truck and trailer impounded and seized the log book and travel papers. Thereafter, at Searcey's request, defendant drove his truck and trailer to the State Highway Maintenance Yard at Brothers, about 12 miles away. The trailer, which had been immobilized from damage suffered in the collision, was temporarily repaired so that it could be moved. The truck and trailer were held at Brothers, and Searcey testified that he would not have released them before the investigation was completed. After Searcey completed his portion of the investigation, he asked defendant if he would like a ride back to Bend. Defendant accepted the offer and rode in the front seat of the police car. Searcey interviewed him again on the way back to Bend. Defendant spent about five hours at the scene.

After arriving in Bend, defendant was asked to wait and speak to Morton, the accident reconstruction expert, and Miller, an expert in P.U.C. inspections. Defendant complied with the request and spent seven to eight hours at the station waiting for, and talking with, the officers. During that time, he was free to roam about in the office and was allowed to use the phone. After talking with the officers, he left the station and checked into a nearby motel. Defendant's truck was released to him on the afternoon of August 20, following an extensive inspection. His papers, without which he could not travel, were detained until August 22.

On August 20, the day after the accident, Searcey contacted two westbound truck drivers who had reported seeing defendant's truck just before the collision. Searcey testified that the first explained that he had observed an eastbound truck and trailer parked in the traveled portion of the eastbound lane. He saw flashers and taillights, but no headlights, flares or roadside reflectors. According to Searcey, the second driver said that he had seen emergency flashers "a couple miles ahead," which disappeared as he got within one-half mile. As he got closer, he saw a truck and trailer parked in the eastbound lane with no lights displayed. He also observed

another vehicle traveling in the eastbound lane, some distance behind the truck. Shortly, thereafter, "all lights on the eastbound vehicle went out. He knew then that there had been an accident."

By August 22, Searcey had concluded that there were sufficient reasons to charge defendant with a crime. He sent a report to the District Attorney recommending that defendant be charged. He contacted defendant in response to defendant's request for accident report forms. During their conversation, Searcey told defendant, for the first time, that criminal charges might be filed. He then advised defendant of his rights for the first time. Thereafter, defendant gave a statement to Searcey that was similar to the others he had given up to that time.

On the basis of those facts, the trial court concluded that: (1) the seizure of defendant's truck and travel papers was illegal, and any evidence derived from them was inadmissible; (2) from the time the truck was seized, defendant was in "custody," and all statements made thereafter were inadmissible; and (3) any statements made after the *Miranda* warnings were given on August 22 were tainted by the earlier conversations and that the taint was not obviated by the warnings. Because the trial judge found that defendant had been in custody, he did not address whether those statements were the "tainted fruit of the unlawful seizure" of the truck. On appeal, the state concedes that the seizure of the truck and log book was illegal. However, it contends that defendant's statements are admissible.

■ The Supreme Court has recently clarified what constitutes custody for *Miranda* purposes. In *Berkemer v. McCarty,* 468 US ___, 104 S Ct 3138, 82 L Ed 2d 317, 336 (1984), a case involving a traffic stop, the court stated:

> "* * * A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. * * *"

The court further noted that "[f]idelity to * * * *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." 468 US at ___, 82 L Ed 2d at 333. *Miranda* warnings need be given only if a defendant is subjected to

restraints comparable to those associated with a formal arrest. 468 US at ____, 82 L Ed 2d at 336.

Two recent Oregon cases have attempted to apply the *Berkemer* rule to automobile accident situations. In *State v. Hackworth,* 69 Or App 358, 685 P2d 480 (1984), an officer was dispatched to the scene of a one-car accident and found a pickup stuck in the mud next to the road. The defendant was attempting to drive it away. The officer smelled alcohol on his breath and noticed other signs of intoxication. During questioning, the defendant made incriminating statements, which ultimately resulted in his arrest for DUII. About 15 minutes elapsed between the officer's arrival and the formal arrest. The officer read the defendant his *Miranda* rights just before his arrest. He appealed the trial court's failure to suppress the statements which he made before he was given the warnings. We applied *Berkemer* and affirmed the trial court.

> "* * * Had defendant not been arrested, any restraint would have been temporary. *A motorist questioned at an accident scene, especially when there is no serious injury, reasonably expects that he will have to answer some questions and have his license and registration checked and that shortly he or the officer will depart.* Like the traffic stop discussed in *McCarty,* the accident investigation took place in public and involved an encounter with only one officer." 69 Or App at 363-64. (Emphasis supplied.)

In *State v. Smith,* 70 Or App 675, 691 P2d 484 (1984), *rev allowed* 298 Or 704 (1985), on facts quite similar to *Hackworth,* we also concluded that a roadside interrogation was noncustodial:

> "* * * Initially, there was no evidence that a crime had been committed and they had no reason to arrest him. Defendant argues that he was in custody from the time that the deputies held him and took him back to their car. However, the totality of the circumstances do *[sic]* not support his conclusion. * * * Once it was established that defendant owned the disabled vehicle, it was reasonable to expect that he would be asked some questions. * * * If defendant had not been arrested, any restraint would have been temporary. The investigation took place in public. This was not the type of oppressive setting to which *Miranda* is directed. *See Berkemer v. McCarty, supra.* We find no violation of defendant's federal constitutional rights." 70 Or App 679-80.

■     Thus, we must consider whether, under the *McCarty* standard, as elucidated in *Hackworth* and *Smith,* defendant was entitled to *Miranda* warnings before he received them on August 22. On the face of the record, several factors arguably support a conclusion that he was in custody. He was the sole survivor of a fatal collision, his truck was disabled, stranding him in the middle of the desert, and he was the focus of police questioning on and off for about 13 hours. Nevertheless, when the facts are evaluated in total, we do not conclude that an individual in the same or similar circumstances as defendant would have felt subjected to restraints equivalent to formal arrest.

Defendant undoubtedly felt some compulsion to remain at the scene and the station until the officers completed their investigation. That did not mean that he was in custody. Any reasonable person involved in a fatal automobile accident would expect to have to participate in a thorough investigation. Under those circumstances, the period of interest and questioning would necessarily be longer than for a minor accident. Admittedly, the emphasized language in the quotation from *Hackworth* might seem to suggest that questioning at an accident scene involving serious injuries or fatalities is automatically custodial. However, it was not our intention to set forth a *per se* rule. The *Berkemer* test is how a reasonable person would perceive his particular circumstances. An average "fender bender" traffic mishap, as in *Hackworth,* is a clear example of a noncustodial situation, because a reasonable person would expect to answer a few routine questions and then depart. On the other hand, in the case of a fatal accident, the same reasonable person would expect to answer more questions and to spend more time with those conducting the on-the-scene investigation. In other words, a reasonable person would usually be willing to tolerate more involvement with the police for a serious accident before concluding that he is in custody than he would for a minor accident. An investigation of a serious or fatal accident may be extensive without being criminal. A person who is a focus of such an investigation is not necessariy in custody on a criminal charge.

Of course, each case varies according to its circumstances and, in this case, defendant may have had some difficulty leaving the scene, because his truck was disabled,

but to the extent that he was required to be there, he was a prisoner of circumstances and not of the police. In fact, defendant was where he was because that is where he put himself. Although the truck was disabled by the collision, the police had nothing to do with either the cause or the location of the accident. Defendant was denied the use of his truck while it was impounded by the police, but it could not have been driven legally in any event, because its headlights were not functioning. We see no indication that defendant could not have walked away at any time.

Defendant was treated in a civil and respectful manner. He was never ordered to do anything. The officers always requested his cooperation. He was not frisked before riding in the police car to Bend and was allowed to sit in the front seat. He was not restrained at the station and eventually left of his own accord to check into a motel. Even though the possibility of a civil suit was discussed with defendant, no one mentioned criminal charges until August 22, just before the *Miranda* warnings were administered. Fidelity to *Miranda* does not require suppression of defendant's statements, because the circumstances of this case were not the type that led to that decision. Defendant was not subjected to restraints substantially equivalent to formal arrest.

■ Having concluded that defendant was not in custody, we must address whether the illegal seizure of his truck and trailer and travel papers tainted the statements he made to police.[1] We conclude that it did not. As noted above, defendant's truck and trailer were disabled in the collision. The repairs which were effected at the scene in order to move the truck to Brothers were temporary, at best. The truck lacked headlights and was suspected of other safety violations which would render it illegal to drive. Impounding the truck merely gave an official name to what had in reality already occurred: the accident had denied defendant the use of his truck.

Reversed and remanded for trial.

**BUTTLER, P. J.,** dissenting.

---

[1] Although the state concedes that it was error to impound defendant's truck, we note that ORS 483.382(4) authorizes police officers to take custody of disabled vehicles which constitute a road hazard.

Because defendant has asserted only his rights under the Fifth Amendment to the United States Constitution, we need not reconsider our statement in *State v. Smith,* 70 Or App 675, 691 P2d 484 (1984), *rev allowed* 298 Or 704 (1985), that Article I, section 12, of the Oregon Constitution requires no more than is required by *Miranda* as most recently interpreted in *Berkemer v. McCarty,* 468 US ___, 104 S Ct 3138, 82 L Ed 2d 317 (1984).

Although *Berkemer,* by its express language, applies only to "ordinary traffic stops," this court in *State v. Smith, supra,* and *State v. Hackworth,* 69 Or App 358, 685 P2d 480 (1984), extended the *Berkemer* analysis to cases where the police were investigating automobile accidents. The rationale of *Berkemer* is that one who is the subject of an ordinary traffic stop must reasonably expect to spend a short time answering questions, at the conclusion of which he may receive a citation and go on his way. In addition, the court pointed out that the "typical" traffic stop does not make the motorist feel that he is at the mercy of the police, because it occurs in public, which reduces the ability of an unscrupulous policeman to use illegitimate means to elicit incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subject to abuse. Further, the court pointed out that the detained motorist typically is confronted by only one or at most two policemen, thereby muting his sense of vulnerability.

For those reasons, the court in *Berkemer* held that there was little danger that a person subjected to an *ordinary* traffic stop would be induced to speak when he would not otherwise do so freely, which was the concern addressed in *Miranda.* Under *Berkemer,* one subjected to an ordinary traffic stop is not entitled to be advised of his *Miranda* rights unless a reasonable person in his situation would have understood himself to be in custody or under restraints comparable to those associated with a formal arrest. *State v. Hackworth, supra.*

It is questionable whether *Berkemer* has any application to this case, not only because it does not involve a traffic stop, much less an ordinary one, but also because the investigation was not a brief one at the scene of a non-serious accident (which distinguishes it from *Smith* and *Hackworth*).

Rather, the investigation here concerned an accident in which two persons were killed at 2 a.m., in an isolated area 47 miles east of Bend. The first officer (Hodson) arrived on the scene at about 2:45 a.m. and asked defendant what had happened and engaged in general conversation about the accident. The trial court ruled that statements made by defendant during that period were not made in a custodial setting, and they were not suppressed.

Hodson waited for Sgt. Searcey to arrive at the scene. When he arrived, he talked to Hodson and examined the scene. He then called in an accident reconstruction expert, because he had found discrepancies between what Hodson told him that defendant had said and the physical facts that he had observed. He also seized defendant's truck and his log book containing his driving papers. He then questioned defendant about the accident and the discrepancies Searcey perceived to exist. Defendant was not advised of his rights.

The trial court found that defendant, after Searcey seized his truck and papers, had been deprived of his liberty in a significant way, as a result of which the later interrogation by Searcey was custodial. Accordingly, it suppressed all statements made by defendant after that time. It also suppressed physical evidence seized from the trailer, which ruling is not contested by the state.

The trial judge applied the test for custodial interrogation enunciated in *Miranda,* rather than that articulated in *Berkemer,* which had not then been decided. I think that he applied the correct test and that he was right under either test. The majority assumes, I think wrongly, that *Berkemer* is applicable, and reaches the astonishing conclusion that a reasonable person in defendant's circumstances would not understand himself to be in custody or under restraints comparable to those associated with a formal arrest. The majority states:

> "* * * He was the sole survivor of a fatal collision, his truck was disabled, stranding him in the middle of the desert, and he was the focus of police questioning on and off for close to 13 hours. Nevertheless, when evaluated in total, we do not believe that an individual in the same or similar circumstances as defendant would have felt subjected to restraints equivalent to formal arrest." 75 Or App at 752.

If defendant was free to leave, it was not until the officers decided to return to Bend at least two hours after the initial contact. At that time, his truck and driving papers had been seized, and the only way he could have gone his own way was on foot, in the dark, headed into the desert alone without supplies. His truck was not disabled, as the majority says, although the trailer was. If the truck and the papers had not been seized, he could have driven away from the scene without having to rely on the officers to take him to Bend.

Applying the *Miranda* test, we have held that depriving a motorist of his driver's license deprived him of his liberty in a significant way. *State v. Bozgoz,* 67 Or App 761, 679 P2d 1377, *rev den* 298 Or 427 (1984). How can it be that the seizure of both defendant's driving papers (the functional equivalent of his driver's license) *and* his truck amounts to a less significant deprivation of liberty than we found in *Bozgoz*?

The trial court made complete findings, analyzed the questions thoroughly and, in my opinion, properly applied the *Miranda* test. I would affirm and therefore dissent.