Argued and submitted November 6, Court of Appeals reversed, trial court affirmed
December 28, 1984

## STATE OF OREGON,
*Petitioner on Review/*
*Respondent on Rehearing,*

*v.*

## GARY PATRICK ROBERTI,
*Respondent on Review/*
*Petitioner on*
*Rehearing.*

(CA 18838; SC 27840)

693 P2d 27

Virginia L. Linder, Assistant Attorney General, Salem, argued the cause and filed petition for petitioner on review/respondent on rehearing. With her on the petition were Dave

Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

J. Michael Alexander, Salem, argued the cause for respondent on review/petitioner on rehearing.

PER CURIAM

## PER CURIAM

This case is before us on remand from the Supreme Court of the United States, *Oregon v. Roberti*, 468 US ___, 104 S Ct 3574, 82 L Ed 2d 873 (1984), for reconsideration in light of that court's recent decision in *Berkemer v. McCarty*, 468 US ___, 104 S Ct 3138, 82 L Ed 2d 317 (1984). The question arises under the Fifth and Fourteenth Amendments of the federal constitution.[1] The issue is whether defendant's inculpatory statements, made to a police officer during a traffic stop after the officer had decided to arrest defendant but prior to formal arrest, were the product of "custodial interrogation" and therefore should have been suppressed because defendant had not been advised of his rights. *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966).

The trial court overruled defendant's motion to suppress. The Court of Appeals held this to be reversible error. *State v. Roberti*, 51 Or App 783, 627 P2d 28 (1981). In a plurality opinion, we reversed the Court of Appeals. *State v. Roberti*, 293 Or 59, 644 P2d 1104 (1982). Three justices dissented. 293 Or at 76, 91, 644 P2d at 1114, 1123. On rehearing, Justice Roberts withdrew her earlier concurrence and joined Justice Lent's dissent, transforming that dissent into the majority opinion. *State v. Roberti*, 293 Or 59, 644 P2d 1104, *reh all* 293 Or 236, 646 P2d 1341 (1982).

The Supreme Court of the United States granted the state's petition for a writ of certiorari, vacated our second *Roberti* decision and "remanded * * * for further consideration in light of *Berkemer v. McCarty*, 468 US ___ (1984). *Oregon v. Roberti, supra*. Having further considered this case, and being of the opinion that the holding in *Berkemer* is dispositive, we withdraw our previous opinions.

The decision of the Court of Appeals is reversed. The judgment of the trial court is reinstated.

---

[1] In this case defendant raised only federal constitutional issues. As noted in our first *Roberti* opinion:

"Defendant has not contended that any right guaranteed to him by either the constitution or the statutes of this state has been violated. His sole claim is that his rights under the Fifth and Fourteenth Amendments to the United States Constitution have been invaded." 293 Or at 64, 644 P2d at 1107.

**LINDE, J.,** concurring.

The United States Supreme Court has remanded this case to us for reconsideration in the light of *Berkemer v. McCarty,* 468 US ___, 104 S Ct 3138, 82 L Ed 2d 317 (1984). In this court, the majority and the dissenters disagree whether, on this remand, we should decide only the disposition of Roberti's case or attempt to elucidate when Oregon law enforcement officers who stop a vehicle for investigation of a suspected offense should give *Miranda* warnings before questioning the occupants. The majority chooses to stop with a bare disposition of this case; the dissenters think we should provide further guidance.

On that question, I agree with the dissent, but on the disposition of Roberti's case, I agree with the majority; hence this concurring opinion.

When this case was previously before us, I wrote:

> "The great virtue of a rule requiring police warnings to suspects whom an officer detains for questioning is, or should be, that the rule tells the officer what to do and when to do it. * * * The test of an opinion that purports to elucidate the rule is how clearly it tells the police under what circumstances to warn such a person before questioning. Police officers deserve and efficient law enforcement require rules that are clear at the time of the investigatory act; a formula designed only for retrospective judgment on a motion to suppress evidence confuses the rule with its consequence."

*State v. Roberti,* 293 Or 59, 91, 644 P2d 1104, 1123 (1982). Because *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966), and now *Berkemer v. McCarty, supra,* lay down federal requirements, this court's role in elucidating those requirements is limited, and the majority's hesitancy to do more than tell trial judges to read *Berkemer* is understandable. *Berkemer* itself asserts that the virtue of the *Miranda* rule is its "clarity" in "informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation," *supra* 468 US at 104 S Ct at 3145, 82 L Ed 2d at 328, quoting *Fare v. Michael C.,* 442 US 707, 99 S Ct 2560, 61 L Ed 2d 197 (1979). But Justice Lent's dissent shows that *Berkemer* falls short of clearly telling police officers and other state officials when *Miranda* warnings are required after an officer stops a vehicle for investigation of a possible offense.

As Justice Lent points out, part of the problem lies in the assumption that placing a person under "formal arrest" has some identifiable and uniform meaning throughout the states. If this event triggers the warning requirement, presumably it does not depend on the officers' using the phrase "you are under arrest"; *Berkemer* denies the "talismanic power" of words. 468 US at ___, 104 S Ct at 3149, 82 L Ed 2d at 333. And the Supreme Court also refers to "restraints *comparable to* those associated with a formal arrest," which implies that actual "formal arrest" is not essential. *Id.* at ___, 104 S Ct at 3151, 82 L Ed 2d at 336 (emphasis added).

A broader problem arises from the Court's references to a "routine traffic stop," *id* at ___, 104 S Ct at 3145, 82 L Ed 2d at 331, an "ordinary traffic stop," *id* at ___, 104 S Ct at 3149, 892 L Ed 2d at 333, and a "typical traffic stop," *id.* It is a problem that arises whenever a court undertakes to base a general rule on the Court's assumptions about human behavior and social phenomena. The *Miranda* rule, of course, is that kind of rule, designed as a prophylactic requirement to forestall potentially involuntary self-incrimination in a wider class of situations than would in fact be found involuntary upon case-by-case examination. And the factual setting about which the Court generalizes in *Berkemer* is that of persons temporarily detained in their automobiles on public roads rather than being placed "in custody" in police stations, in police vehicles, or perhaps in other locations. The Court holds that in this setting a brief detention is so unlikely to "compel" answers to an officer's question that it can be excluded from the prophylactic rule of *Miranda v. Arizona.*

It is not for us to question whether the Court's assumption about the psychology of drivers' roadside confrontations with police officers is true or false. The accuracy of the assumption is not essential to the Court's drawing a prophylactic line as distinct from determining whether an incriminatory statement was compelled in a concrete case. Two questions, however, are important for courts and officials seeking to follow *Berkemer.*

One question is what kind of "traffic stops" the Supreme Court means by "ordinary," "typical," and "routine," so as not to give rise to *Miranda* requirements. Apparently they are to be distinguished from extraordinary or

untypical traffic stops that are not "routine." The term "traffic stop" may refer to any occasion when an officer for whatever reason signals a driver to halt a vehicle being driven on a public road, or it may refer to stopping such a vehicle for a reason arising from the administration of the traffic laws. The first reading would include occasions when an officer stops a driver in order to investigate a possible offense unrelated to traffic, for instance because a car or an occupant was seen near the scene of a crime or because the car fits the description of one reported to have been stolen. Although the setting of the stop may be no more intrinsically coercive, it seems that the Court's qualifying words "ordinary," "typical," and "routine" exclude such stops and limit the *Berkemer* holding to the enforcement of what may be called "traffic laws."[1] If the officer's purpose in stopping a driver goes beyond traffic law enforcement, it would appear unwise to rely on *Berkemer* to omit *Miranda* warnings before questioning the occupants of the detained vehicle.

Even when a violation of a traffic law is the reason for the stop, the second question that *Berkemer* leaves to be determined is when the officer's conduct of a particular roadside stop goes beyond the "ordinary," "typical," or "routine" so as to negate the Supreme Court's psychological assumptions about the pressures that such stops exert upon a detained person. 468 US at ___, 104 S Ct at 3149-50, 82 L Ed 2d at 333-334. When is a "temporary" detention no longer so "brief," 468 U.S. at ___, 104 S Ct at 3149, 82 L Ed 2d at 333, that it exceeds the "ordinary"? When a motorist is kept waiting for half an hour without explanation while a license or registration is checked, or only after one hour? Does it matter whether the detention is on an isolated road or at night rather than in "public view"? 468 US at ___, 104 S Ct at 3150, 82 L Ed 2d at 334.

For both these reasons the better practice may be routinely to give *Miranda* warnings in stops for suspected offenses as serious as driving under the influence of intoxicants, when this is likely to involve detaining the driver for a

---

[1]This is by no means a self-evident category. Compare, for instance, a stop for a possible vehicle code felony of failing to perform the duties of a driver involved in an accident, ORS 483.602(4)(a), with a stop for a possible negligent homicide arising from the same accident and defined in the criminal code, ORS 163.145.

period of time "untypical" of "ordinary" traffic stops and first preventing a departure unless the driver convinces the officer that he or she is sober, rather than to rely on hewing as close as possible to the uncertain line drawn in *Berkemer* and invite needless judicial hearings on the issue whether that line was crossed. But that is for others to say in the first instance; we cannot independently instruct the police in an appeal based on the Fourteenth Amendment. What this case illustrates once again, however, is the folly of a system in which the details of day-to-day police investigatory practices are derived directly from United States Supreme Court opinions under the Fourteenth Amendment , the highest and most abstract level in the nation's hierarchy of law, without any intermediate enactment of directives by state or local policymakers that can then be tested against constitutional standards. *Cf. State v. Atkinson,* 298 Or 1, 688 P2d 832 (1984). The present approach, as I wrote in another context, "is little better than sending the police out with the latest United States Supreme Court advance sheets in their pockets." *State v. Greene,* 285 Or 337, 356, 591 P2d 1362, 1371 (1979) (Linde, J., specially concurring).

I know of no law that obliges a driver to answer an officer's questions or perform "field tests" directed at determining whether the driver has committed the crime of driving under the influence of intoxicants. Reluctance to inform the detained driver that such cooperation is voluntary can only demonstrate the state's willingness to take advantage of those of its citizens who are ignorant of their rights though it must respect the rights of those who know them.[2] In the present case, however, defendant acceded to the officer's requests, and I read *Berkemer v. McCarty* to imply that the Supreme Court would not hold that defendant's conviction rested on a violation of the Fourteenth Amendment. I therefore concur in the result.

**LENT, J.,** dissenting.

The majority states that the "holding" in *Berkemer v. McCarty,* 468 US ___, 104 S Ct 3138, 82 L Ed 2d 317 (1984), is

---

[2] I do not imply that the state could not constitutionally require such cooperation, including answers to questions, if only licensing as a driver rather than potential criminal penalties were involved. *Cf.* my original opinion in this case, 293 Or at 94, 644 P2d 1125, and *State v. Schroeder,* 296 Or 648, 678 P2d 1227 (1984) (Linde, J., dissenting).

"dispositive" of the case at bar.[1] In a strict sense, the "holding" of *Berkemer* is simply that in the circumstances established by the evidence in that case the police officer, prior to arresting McCarty, was not required by the rule of law of *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966), to advise him of his constitutional rights in order to make his answers to interrogation admissible in evidence. If that is the "holding" to which the majority opinion refers, the decision of this court is nothing more than case matching, *i.e.,* the court, without discussion or express analysis, is just matching the facts of *Berkemer* with those in the instant case and inferring that if the Supreme Court of the United States were deciding this case, the Court would decide in the state's favor.

·  That strict sense of "holding" is not the sense in which we usually employ that word. We usually employ that word to announce a rule of law, just as did the *Berkemer* Court in Part II of its opinion. *See* footnote 1, *supra.* If the majority's decision is on the basis of a "holding" in the usual sense, therefore, it must have been able somehow to divine what was the rule of law pronounced in Part III of the *Berkemer* opinion.

The majority does not identify the "holding" purportedly applied. I must confess that I am not so confident as is the majority that a "holding" can be identified in Part III of the opinion in *Berkemer.* I shall try.

In the first paragraph of Part III the *Berkemer* opinion poses the issue

"whether the roadside questioning of a motorist detained

---

[1]There is an easily identified holding, in the sense of a stated rule of law, in Part II of the opinion in *Berkemer v. McCarty,* 468 US ____, 104 S Ct 3138, 82 L Ed 2d 317 (1984), as follows:

"We hold therefore that a person subjected to custodial interrogation is entitled to the benefit of the procedural safeguards enunciated in *Miranda,* regardless of the nature or severity of the offense of which he is suspected or for which he is arrested." (Footnote omitted.)

468 US at ____, 104 S Ct at 3148, 82 L Ed 2d at 331. In this jurisdiction we have shared that view of the law for several years. All other courts were not of the same mind. *See* footnote 7 of the opinion in *Berkemer.* I assume that the majority's reference to "holding" is not to that holding in Part II but to the "holding" it seems to find in Part III of the *Berkemer* opinion.

pursuant to a routine traffic stop should be considered 'custodial interrogation.' "

468 US at ____, 104 S Ct at 3148, 82 L Ed 2d at 331. To thus state the issue, the eight members of the Court who joined in Part III necessarily believed that the words "routine traffic stop" have an identifiable referent.[2] Nowhere do those members of the Court share with us what is that referent. The use of "routine" immediately raises the question of *whose* routine the Court has in mind. Does the Court believe that there is just one routine common to all of the various traffic control officers throughout the territories and the states, and political subdivisions thereof, that are subject to the reach of the Constitution of the United States?

Because the Court purported to establish a rule of law to apply in the case of "routine" traffic stops, a traffic control officer, a lawyer and a judge, not to mention a motorist, must have some test for determining whether a given traffic stop is or was "routine" (or "ordinary" or "typical" or "usual").[3] In ruling on the admissibility of a defendant's statements, does the trial judge first take evidence to determine if there is such a thing as a "routine" (and, necessarily, whose routine) traffic stop, or does he just apply his individual private knowledge of

---

[2]In posing the same issue in the very first paragraph of the opinion, the Court omitted the adjective "routine," as did the Court in the last sentence of Part I of its opinion. The inconsistency in terminology continued throughout the general discussion in Part III of the opinion. In order, the following terms are used from 468 US at ____, 104 S Ct at 3149, 82 L Ed 2d at 332, to 468 US at ____, 104 S Ct at 3151, 82 L Ed 2d at 335: "a traffic stop," "a traffic stop," "a traffic stop," "an ordinary [a new adjective] traffic stop," "a traffic stop," "an ordinary traffic stop," "a traffic stop," "an ordinary traffic stop," "the typical [yet another modifier] traffic stop," "the typical traffic stop," "an ordinary traffic stop," "the usual [yet another descriptive word] traffic stop," "ordinary traffic stops" and "a traffic stop." A reader must surely speculate whether there is an intended difference in meaning or a discovery and vigorous use of Roget's Thesaurus.

[3]Because in this opinion I am only trying to get the majority to realize that there is no "holding" in *Berkemer v. McCarty, supra,* to apply to this case, I shall not expand on other weaknesses of that Court's analysis. Briefly, however, I should call attention to the fact that the Court's first premise for reasoning that a motorist's will is not likely to be overborne by his detention is that the detention is "presumptively temporary and brief." If in the particular case it is neither temporary nor brief, does that "holding" disappear with the refutation of the Court's "presumption"? The Court's second premise is that circumstances associated with a "typical" traffic stop are not such as to make the motorist feel "completely" at the mercy of the police. If in a given case the circumstances are such that the motorist reasonably does feel that he is at the mercy of the police, does the "holding," which the majority of this court has apparently identified, become inapplicable?

the meaning of that term? Does that trial judge make a finding of fact as to what is a routine traffic stop? If so, I suppose he must then take evidence of what happened in the traffic stop in the case before him to determine if it was a routine traffic stop. Is the trial judge's finding of what is a routine traffic stop a finding that must be accepted by the appellate courts if there is evidence to support it, or is it rather one of those facts that appellate courts find in determining whether constitutional standards of due process have been met, such as "voluntariness" of a purported confession? *See, e.g., Clewis v. Texas,* 386 US 707, 87 S Ct 1338, 18 L Ed 2d 423 (1967), and *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968).

As I pointed out in my opinion (which eventually became the opinion under which this court decided the case) the first time we decided the case at bar, *State v. Roberti,* 293 Or 59, 76, 644 P2d 1104, 1114 (1982), the problem with starting analysis with a term such as a "typical [or routine] traffic stop" is that a driving while under the influence of intoxicants case does not fit the mold of a typical traffic stop:

"The state also contends that this was a 'typical traffic stop investigation.' That may or may not be so, depending upon how one looks at it. Consider, that in cases in which one is accused of violation of the basic rule, violation of the rules of the road, operating a vehicle with improper or defective equipment, and like charges, the officer has already personally observed all of the elements of the offense before he signals the motorist to stop the vehicle. It is the officer's observation of a violation of the law which occasions the stop. He has no further need to investigate except to obtain identification of the driver in order to charge him by correct name.

"Such is not the case with respect to the offense of operating a vehicle while under the influence of intoxicants. True, the officer has probably observed some other traffic violation which triggers his decision to signal the motorist to stop. A good example is found in the case at bar where the officer has observed a vehicle being operated in a winter month at a time of darkness in a rural area at a very high rate of speed and in a manner so erratic as to arguably support a charge of reckless driving. At the time the officer signalled defendant to a stop, he had more than enough evidence to support a charge of violation of the basic rule, and this could well have been a typical stop upon that charge. In order to gather evidence of driving while under the influence of intoxicants, however, the officer had to do something after the

'typical traffic stop.' He had to obtain evidence that the defendant was 'under the influence.'

"The typical way in which an officer goes about gathering that additional evidence which would prove the element of being under the influence is by way of exercise of the officer's senses of smell, sight and hearing and by way of interview. The officer may determine through his sense of smell that the driver has consumed an alcoholic beverage. Through his sense of sight he may observe whether the driver's face is flushed, the appearance of his eyes and the orderliness of his clothing. Through the same sense the officer may observe the driver's ability to control his body and limbs. Through the sense of hearing the officer can determine whether the driver's diction and enunciation are apparently out of norm and whether the driver is able to express his thoughts in a logical manner. The process of interviewing is an aid to the officer in gathering that kind of evidence, but it is also utilized to gather evidence by way of admissions and to rule out claims of injury or illness as a cause of the driver's condition."

293 Or at 86-87, 644 P2d at 1120-1121.

One will search in vain to find a rule of law stated in Part III of the *Berkemer* opinion that directly settles the issue posed at the outset of Part III. The Court at one point tells us that it does not draw the line as to when custody commences by reference to "formal" arrest:

"Either a rule that *Miranda* applies to all traffic stops or a rule that a suspect need not be advised of his rights until he is formally placed under arrest would provide a clearer, more easily administered line. However, each of these two alternatives has drawbacks that make it unacceptable."

468 US at ___, 104 S Ct at 3151, 82 L Ed 2d at 335. On the other hand, the Court seems to be saying with one breath that a motorist is not in custody until the trappings of formal arrest obtain, but, with almost the same breath, that the inquiry must turn on something called "practical purposes."

"It is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' *California v. Beheler,* 463 US [1121], ___ (1983) (per curiam). If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda.*"

468 US at ___, 104 S Ct at 3151, 82 L Ed 2d at 335.

What does that text mean? The first sentence means that custody for *Miranda* purposes turns on the meaning of "formal arrest." Because that term does not occur in the Fifth Amendment to the Constitution of the United States, one must look elsewhere for its definition. Does the *Berkemer* Court intend the reach of the Fifth Amendment to depend upon the various definitions of "arrest" or "formal arrest" set forth in state statutes? If so, the motorist's constitutional rights depend upon the geographical boundaries of the various states. I wonder what the term "formal arrest" means in Oregon. Where do I go to find that term defined?

The second sentence describes the snake swallowing his tail. One is "in custody" for *Miranda* purposes if he is "in custody" for practical purposes. For "practical purposes" it seems beyond dispute that one is in custody if he is not free to leave.

In deciding the case before it, the *Berkemer* Court in the last two paragraphs of Part III holds that McCarty was not in custody until he was "arrested." In those two paragraphs, however, appears the Court's own statement of the "only relevant inquiry" in determining if one is in custody:

> "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."

468 US at ___, 104 S Ct at 3152, 82 L Ed 2d at 336.

At this point any thinking person must ask just what "situation" does the Supreme Court of the United States have in mind. Some members of this court, both on the majority and minority of this probably final disposition of Mr. Roberti's case, have questioned whether that means that the defendant should understand that he is no longer free to leave without permission of the police. To me it is inescapable that the defendant's freedom to depart (or want thereof) is the very crux of the matter. I do not reach this conclusion by any burst of insight on my part; rather, I look to a decision of the Supreme Court of the United States often cited to show interrogation which is not custodial. (In fact, it was cited for that purpose in the eventual minority opinion of this court in

*State v. Roberti, supra,* on the first go around, 293 Or at 73.) The case is *Oregon v. Mathiason,* 429 US 492, 97 S Ct 711, 50 L Ed 2d 714 (1977). There the very Court that now tells us that a motorist would not feel free to leave the scene in *Berkemer* told us that Mr. Mathiason was not in custody because he was free to leave:

> "In the present case, however, there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a 1/2-hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way.'"

429 US at 495, 97 S Ct at 714, 50 L Ed 2d at 719.

The judge who authored the opinion for the Court in *Berkemer* is the very judge who dissented in *Oregon v. Mathiason, supra,* where he stressed that "formalities" could not control. Now he speaks to "formal" arrest. In his dissent in *Mathiason* he took issue with the majority's disposition grounded on the want of restriction of Mathiason's freedom to depart. Among other things, that eminent jurist wrote:

> "It is true that respondent was not formally placed under arrest, but surely formalities alone cannot control. At the very least, if respondent entertained an objectively reasonable belief that he was not free to leave during the questioning, then he was 'deprived of his freedom of action in a significant way.'" (Footnote helpful to this dissenting opinion omitted.)

429 US at 496, 97 S Ct at 714-15, 50 L Ed 2d at 720. Now, in *Berkemer,* that same jurist is singularly impressed with what the opinion calls "formal" arrest or its equivalent, although the definition of that nebulous term must depend upon a source not identified in the Fifth Amendment or the opinion.

To me it is obvious that the Supreme Court of the United States has now, except for lip service, abandoned any "bright line" thought to have been established by *Arizona v. Miranda, supra,* and retreated to asking the police officer in the field, the trial courts and the courts inferior to the Supreme Court of the United States to determine if the atmosphere of interrogation is actually coercive. I can only

hope that the Supreme Court of the United States does not work its way back to overruling *Brown v. Mississippi,* 297 US 278, 56 S Ct 461, 80 L Ed 682 (1936).

Taking the *Berkemer* text at face value and examining what has happened in this case, I find that this court has already determined how Mr. Roberti "would have understood his situation." By reason of our decision upon rehearing, *State v. Roberti,* 293 Or 236, 646 P2d 1341 (1982), the opinion I authored originally as a dissent in *State v. Roberti,* 293 Or 59, 644 P2d 1104 (1982), became the lead opinion of this court. We said:

"Of course, the record discloses circumstances in this case that would lead any reasonable man in the position of the defendant to realize that he was not free to leave. He had been signalled to stop his vehicle by the officer's emergency light, and if he had not obeyed that signal, he would have been guilty of the crime of fleeing or attempting to elude a police officer. He was performing a variety of tests at the behest of the officer. It defies common sense to suggest that in those circumstances a reasonable person would believe anything other than that he was not free to leave.

"I need not decide whether *Miranda* warnings were required prior to the time when the officer asked the question with which this case is concerned. Immediately prior to the time the question was asked, a reasonable person in the same circumstances would have believed he was not free to leave, and this defendant was, *in fact,* not free to leave by reason of the officer's decision to prevent defendant's leaving. I would hold that the question was, therefore, custodial interrogation, and the defendant's objection should have been sustained." (Footnotes omitted.)

293 Or at 90, 644 P2d at 1122-1123.

Of course, earlier in its opinion the *Berkemer* Court stated:

"Certainly few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so."

468 US at ___, 104 S Ct at 3149, 82 L Ed 2d at 332. The Court noted that although that was a seizure of the person for Fourth Amendment purposes, it did not amount to custody for Fifth Amendment purposes. This certainly seems to me to be

inconsistent with what the Court later said to be the only relevant inquiry. Because the latter point is where the *Berkemer* Court's wandering discourse led, I would accept the Court at its word and accordingly reverse the conviction in the case at bar.[4]

The questions which I have raised in this separate opinion will have to be answered to dispose of cases in the trial courts. This court should write an opinion that will give guidance for disposition. The majority does not even purport to do that; rather, it disposes of just this case.

It apparently does that by some silent collective decision that this was a "routine" traffic stop. The majority should, even just to dispose of this case, define such a stop and share with the rest of the world how the definition was achieved. Can the majority really represent that it knows what a routine traffic stop may be? (Maybe it is one of those things such as pornography, which a prominent judge once confessed he could not define but certainly knew it when he saw it.) Unless the majority can define the term, how can it possibly decide that Mr. Roberti's stop meets the definition? If this stop was not a routine traffic stop, the *Berkemer* decision can have no application at all, for that decision deals only with routine traffic stops.

Insofar as the teaching of this opinion is concerned, every trial court will have to determine first what is a routine traffic stop and then whether the stop before it is one. Only if that is so, can the trial court then proceed to wrestle with the other loose ends of the *Berkemer* opinion and the decision of this court to dispose of challenges to admissibility of answers to police interrogation.

Roberts, J., joins in this dissenting opinion.

---

[4]In a post *Roberti* decision we came to essentially the same conclusion. In *State v. White,* 297 Or 302, 685 P2d 983 (1984), we expressed the test alternatively:

"We now hold that interrogation is custodial under *Miranda* if the police officer actually knows that he would not let the person being questioned leave or if the officer should be aware that the totality of circumstances in which the interrogation takes place is such that the person questioned would reasonably believe he is not free to leave."

297 Or at 310, 685 P2d at 987. The first alternative has been vitiated by the decision in *Berkemer v. McCarty, supra,* but the second alternative embodies the very inquiry that the *Berkemer* opinion states to be the only relevant inquiry.