Submitted on record and briefs April 25, affirmed October 14, 1987

## STATE OF OREGON,
*Respondent,*

*v.*

## WILLIS TRENTON NEELY,
*Appellant.*

### (36281; CA A35044)
743 P2d 1141

Gary D. Babcock, Public Defender, and Diane L. Alessi, Deputy Public Defender, Salem, filed the brief for appellant.

Dave Frohnmayer, Attorney General, James E. Mountain, Jr., Solicitor General, and Terry Ann Leggert, Assistant Attorney General, Salem, filed the brief for respondent.

DEITS, J.

Richardson, P. J., specially concurring.

Newman, J., concurring in part; dissenting in part.

## DEITS, J.

Defendant appeals his conviction for robbery in the second degree. He assigns as errors the trial court's refusal to suppress a gun surrendered by him to his probation officer, the denial of his motion for judgment of acquittal of robbery in the second degree and the court's refusal to instruct the jury on robbery in the third degree. We affirm.

On March 25, 1984, a convenience store in Bend was robbed by a man who threatened the clerk by lifting his jacket to display the grip of a pistol that was thrust into his belt. Earlier that day, there had been a residential burglary in Bend in which a .357 Magnum pistol had been stolen. Defendant was on probation, under the supervision of probation officer Murray. On March 26, 1984, the Bend city police asked Murray for a photograph of defendant, who was a suspect in the robbery and the burglary. Murray tried to contact defendant to question him about the crimes and also about his absence from work and possible use of alcohol. He was unable to contact defendant but left messages with his wife and at his work.

On March 27, defendant stopped Murray in the parking lot at Murray's office and asked to speak to him. They went to the office, where Murray informed him that the police were looking for him in connection with the robbery. Murray asked defendant if he had done it; he said that he had not. Murray then telephoned the police to have them come to the office to question defendant about the robbery. He did not tell Murray whom he was calling. As Murray was identifying himself to the dispatcher, defendant suddenly blurted out, "I did it. I'm sorry. I did it." He lifted up his shirt, displaying a pistol and handed it to Murray, who inspected the pistol and determined that it was unloaded. Murray asked him several more questions about the robbery. He generally refused to answer, but did say, "The clerk can I.D. me," and, in response to Murray's question about what happened to the money, "I gave it to some bums."

Murray did not give defendant *Miranda* warnings, nor did he tell him that he was not free to leave. Murray later testified that he would not have allowed him to leave if he had tried to do so before the police arrived. When the police arrived, Murray gave them the weapon. Defendant and Murray spoke alone for several moments. The police then reentered the office, arrested defendant for unauthorized use of a motor vehicle and advised him of his *Miranda* rights.

Defendant was indicted for robbery in the first degree. ORS 164.415. In response to defendant's motion, the court concluded that he was in custody when he spoke to Murray, and it suppressed his three incriminating statements. However, the court refused to suppress the gun. At the close of the state's case, the court granted defendant's motion for acquittal of robbery in the first degree, because the state failed to prove that he was armed with a deadly weapon. However, the court denied his motion for acquittal of robbery in the second degree, and the jury found him guilty of the charge. Defendant appeals.

He argues that, because the gun was the direct product of his statements, which were suppressed because they were elicited before he was given *Miranda* warnings, it should have been suppressed under *State v. White,* 59 Or App 61, 620 P2d 184 (1982), *modified* 297 Or 302, 685 P2d 983 (1984). The state argues that *Miranda* warnings were not required because, when the statements were made and the gun was surrendered, he was not in custody,[1] his statements were volunteered and, even if he was in custody, probation officers are not required to give *Miranda* warnings.

The present state of the law is that the Oregon Constitution does not require *Miranda*-type warnings if a person is not in "full custody." *State v. Smith,* 301 Or 681, 725 P2d 894 (1986). Because defendant was not in "full custody," as that term appears to have been used by Judge Jones' concurrence in *Smith,* we decide the constitutional issues raised by defendant only under the federal constitution.[2]

---

[1] Although the state did not appeal the pretrial suppression of defendant's statements, that does not preclude the state from arguing at this juncture that defendant was not in custody. *State v. White,* 297 Or 302, 307 n 4, 685 P2d 983 (1984).

[2] Notwithstanding footnote 2 in *State v. Kell,* 303 Or 89, 734 P2d 334 (1987), we conclude that *State v. Smith, supra,* compels the conclusion that Article I, section 12, does not mandate *Miranda*-type requirements in this case. In *Smith,* the issue was

"[w]hether Article I, section 12, of the Oregon Constitution requires that persons detained for questioning by law enforcement officers be given warnings similar to those required by *Miranda* * * *." *State v. Smith, supra,* 301 Or at 683. (Footnotes omitted.)

The three-member plurality concluded that Article I, section 12, does not require that *Miranda*-type warnings be given in any situation. The two dissenters concluded that Article I, section 12, requires that warnings be given to persons in custody. Judge Jones concurred with the majority's conclusion that warnings need not have been given to Smith but concluded that Article I, section 12, requires that individuals in

■   An individual must be given *Miranda* warnings when subjected to "custodial interrogation." *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). When determining whether questioning is "custodial interrogation," "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 US 1121, 1125, 103 S Ct 3517, 3520, 77 L Ed 2d 1275 (1983). When defendant made the statements, he was not under arrest, nor was his freedom of movement restrained. He freely went to meet Murray, *Oregon v. Mathiason,* 429 US 492, 97 S Ct 711, 50 L Ed 2d 714 (1977); *State v. Hickam,* 71 Or App 471, 692 P2d 672 (1984), and voluntarily entered Murray's office. Murray sat at his desk, and defendant sat in a chair adjacent to Murray's desk. There is no evidence that he was physically restrained in any way. He was not told that he was not free to leave.

The questioning of defendant as a suspect does not itself mean that he was in custody. *Oregon v. Mathiason, supra; State v. Fields,* 291 Or 872, 635 P2d 376 (1981). The fact that he did not freely leave is not relevant in determining whether custody existed when the gun was relinquished. *State v. Fields, supra.* Murray's testimony that he would not have allowed defendant to leave before the police arrived does not compel the conclusion that he was in custody. An officer's uncommunicated intention not to allow a person being questioned to freely leave at any time is not an independent basis for determining custody.[3] *See State v. Roberti,* 298 Or 412, 426

---

"full custody" be warned. In this case, we conclude that defendant was not in "full custody" when he made the incriminating statements and surrendered the gun. Hence, it is apparent that four judges agree that defendant need not have been warned under Article I, section 12. The *State v. Kell, supra,* footnote cited by the dissent is not contrary to this conclusion.

[3] Before *Berkemer,* there was some confusion concerning whether the officer's subjective intent was a relevant consideration in deciding if a person was in "custody" for purposes of the *Miranda* rule in this state. In *State v. White,* 297 Or 302, 685 P2d 983 (1984), the court stated:

"We now hold that interrogation is custodial under *Miranda* if the police officer actually knows that he would not let the person being questioned leave or if the officer should be aware that the totality of circumstances in which the interrogation takes place is such that the person questioned would reasonably believe he is not free to leave." 297 Or at 310.

However, the *White* court was applying its holding in *State v. Roberti,* 293 Or 236, 646 P2d 1341, *vacated and remanded sub nom Oregon v. Roberti,* 468 US 1205, 104 S Ct

n 4, 693 P2d 27 (1984) (Lent, J., dissenting); *State v. Hickam,* *supra.* As the United States Supreme Court concluded in *Berkemer v. McCarthy,* 468 US 420, 104 S Ct 3138, 82 L Ed 2d 317 (1984):

> "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." 468 US at 442. (Footnote omitted.)

We hold that, under the totality of the circumstances, when defendant made the statements and surrendered the weapon, he was not in custody.[4] *Minnesota v. Murphy,* 465 US 420, 104 S Ct 1136, 79 L Ed 2d 409 (1984).

Defendant next contends that the court erred in denying his motion for judgment of acquittal on the charge of robbery in the second degree. Robbery in the second degree is committed when a person "represents by word or conduct that the person is armed with what purports to be a dangerous or deadly weapon." ORS 164.405(1)(a). The evidence indicates that, during the armed robbery, while lifting his jacket to expose the grip of a pistol that was thrust in his belt, defendant ordered the clerk to give him money. His conduct clearly comes within the language of the statute defining second degree robbery and, thus, the court properly denied defendant's motion.

Defendant, relying on the concurring opinion in *State v. Vance,* 285 Or 383, 591 P2d 355 (1979), argues that the legislature did not intend robbery in the second degree to encompass robberies committed with real, but unloaded, weapons. In *Vance,* the issue was whether pointing an unloaded real gun at another person constituted robbery in the first degree.[5] The defendant's argument was that, because

---

3574, 82 L Ed 2d 873 (1984), *opinion withdrawn State v. Roberti,* 298 Or 412, 693 P2d 27 (1984), and *Roberti* was vacated in the light of *Berkemer.*

[4] Because of our disposition of this issue, we need not decide the state's other contentions.

[5] ORS 164.415 provides:

"(1) A person commits the crime of robbery in the first degree if the person violates ORS 164.395 and the person:

"(a) Is armed with a deadly weapon; or

"(b) Uses or attempts to use a dangerous weapon; or

"(c) Causes or attempts to cause serious physical injury to any person."

the definition of second degree robbery included such conduct, the legislature did not intend the conduct to constitute first degree robbery. The court concluded that the legislature did not intend the adoption of the criminal code to abrogate the common law inference that a gun used in a robbery and pointed at a victim within firing range is loaded. Thus that conduct *could* be first degree robbery.

In the concurring opinion in *State v. Vance, supra,* on which defendant here relies, Judge Linde pointed out that, by concluding that the conduct in question may be first degree robbery, it follows that the legislature could not have intended the same conduct to be second degree robbery. Judge Linde explained:

> "On its face, this definition of second degree robbery seemed to cover a threat with a real but empty gun. Such a threat would appear to represent that the robber is armed with what purports to be a dangerous or deadly weapon. If so, the legislature presumably would not have meant the identical threat also to suffice for an inference that the weapon was in fact loaded, raising the crime to first degree robbery, without additional support in the evidence." 285 Or at 396.

The court's decision in *State v. Vance, supra,* does not compel the conclusion that a threat with a real, but unloaded, gun may never be second degree robbery. The court did not hold that it may be inferred that a gun is loaded *every time* the state offers proof that a defendant represented being armed with a gun. Rather, the court held that the inference was permissible from the additional fact in that case that it was "pointed at" the victim. Thus, under facts which differ from *Vance,* such as in this case, a threat with a real, but unloaded, gun may be second degree robbery. In addition, as Judge Linde recognized in his concurring opinion in *State v. Vance, supra,* accepting the conclusion that a robbery involving a threat with a real, but unloaded, gun can never be second degree robbery creates an absurd result. A robber using a toy gun could be charged with second degree robbery, but the use of a real, but unloaded, gun would result in a conviction only for third degree robbery. We do not believe that the plain language of the statute compels such a result nor that the legislature intended it.

■ Defendant's last argument is that the court erred in

failing to give his requested instruction defining robbery in the third degree. Because there was no evidence or reasonable inference from which the jury could "rationally and consistently find the defendant guilty of [third degree robbery] and innocent of [second degree robbery]," the court did not err. *State v. Washington,* 273 Or 829, 836, 543 P2d 1058 (1975); *see State v. White,* 87 Or App 194, 741 P2d 930 (1987).

Affirmed.

**RICHARDSON, J.,** specially concurring.

I concur in the affirmance of defendant's conviction, but I disagree with the majority's analysis of whether the gun should have been suppressed. I agree with its handling of the other claims of error.

A principal issue only lightly touched on in the majority opinion and the dissent is, assuming that defendant's statements were properly suppressed, must the gun also be suppressed.

Defendant appeals his conviction for robbery in the second degree. He was also convicted in the same trial for the crimes of unauthorized use of a motor vehicle and being an exconvict in possession of a firearm. He does not appeal those convictions. The vehicle he used without authorization was a taxicab which he had stolen. The firearm he possessed unlawfully as an exconvict was the same firearm involved in the robbery charge and is the subject of the motion to suppress. Curiously, he does not challenge the use of the firearm as evidence in the charge of possession as an exconvict.

Defendant's initial motion to suppress related only to oral statements which he made to his probation officer, Murray. The trial court's written findings are:

"Defendant's probation officer (Murray) was contacted by the City of Bend Police Department concerning defendant's suspected involvement in an armed robbery. They requested that Murray contact defendant and procure a picture of him. Murray left a message for defendant to contact him with defendant's wife and also at defendant's place of employment. Later, defendant met Murray at Murray's office. Murray asked defendant if he had 'done the robbery.' The defendant denied committing it and said he could account for his whereabouts. Murray phoned the police department. As he was

talking to the dispatcher, the defendant blurted, 'I did it; I am sorry,' and handed a gun to Murray that he had under his shirt.

"After asking the police to come to his office, Murray questioned defendant about the details of the armed robbery. In response to a question defendant said, 'The clerk can I.D. me.' When asked what he did with the money, he responded, 'I gave it to some bums.' In being asked to account for his whereabouts, he admitted stealing a taxicab.

"Murray did not advise defendant of his Miranda rights. There were no threats or promises made and, although defendant had been drinking, his statements were made knowingly. Murray did not intend to allow defendant to leave until the police had talked to him and would have arrested him if defendant had tried to leave."

The court concluded that defendant's statements, "I did it; I am sorry," "'The Clerk can I.D. me" and "I gave the money to some bums" were in response to custodial interrogation and were suppressed because defendant was not advised of his constitutional rights. Defendant's confession that he stole the taxicab was not suppressed, because the court concluded that it was not a product of custodial interrogation. Defendant does not claim that the court erred in refusing to suppress his admission that he stole the taxicab.

After defendant's conversation with Murray, two police officers arrived and questioned him. He was arrested at that time for unauthorized use of a motor vehicle and he took the officers to where he had hidden the taxicab. Defendant filed a supplemental motion to suppress the gun which he had given to Murray. He cited *State v. White,* 297 Or 302, 685 P2d 983 (1984), and argued that discovery of the gun by Murray was a direct product of the unlawful interrogation. In the trial court, the state argued that the gun was voluntarily disclosed by defendant, not in response to any interrogation, that it was seizable as incident to the arrest that followed and that it would have inevitably been discovered by the police when they arrested him in Murray's office.

Although I agree with the state that defendant's act of giving the gun to Murray was a free and voluntary act, I do not agree that that is a particularily relevant conclusion. As defendant argues, the disclosure of the gun was a non-verbal communication in conjunction with his statement that he

"did it," which was a direct response to Murray's question whether defendant had committed the robbery. His verbal responses to the questions were also freely and voluntarily made but were suppressed, because Murray had not properly advised defendant of his *Miranda* rights.

· The parties stipulated that Murray had authority to arrest defendant for a parole violation; but he did not in fact make such an arrest. The relationship between the surrender of the gun and the subsequent arrest of defendant for unauthorized use of a vehicle is too attenuated to support seizure of the gun incident to that arrest.

I agree with the state's argument, presented to the trial court, that the gun should not be suppressed as physical evidence, because it would have inevitably been discovered in defendant's possession when he was arrested. We described the concept of "inevitable discovery" in *State v. Hacker,* 51 Or App 743, 627 P2d 11 (1981); *see also State v. Brown,* 47 Or App 201, 613 P2d 1107 (1980); *State v. Garrison,* 21 Or App 155, 534 P2d 210, *rev den* (1975). In order to invoke this exception to the rule requiring exclusion of illegally secured evidence, the state must establish that the evidence would have been discovered and that the law enforcement officers did not act in bad faith to hasten the otherwise inevitable discovery of the evidence. *State v. Hacker, supra.*

In *State v. Miller,* 300 Or 203, 709 P2d 225 (1985), *cert den* ___ US ___ (1986), the court discussed the contours of the rule:

> "We are persuaded that the doctrine of inevitable discovery encompasses a two-part test. The prosecution must establish by a preponderance of the evidence: (1) that certain proper and predictable investigatory procedures would have been utilized in the instant case, and (2) that those procedures inevitably would have resulted in the discovery of the evidence in question." 300 Or at 226.

The evidence of defendant's arrest is not disputed, and the court found that he admitted stealing the taxicab. He was arrested on the basis of incriminating statements which were not suppressed; a ruling which defendant does not challenge on appeal. The arrest was not based on unlawfully obtained evidence. Although there is no direct evidence that defendant was searched when arrested or when he was later lodged in jail,

it is common knowledge that persons are searched when arrested and taken into custody and before being lodged in jail. It is a virtual certainty that when the police officer arrested defendant for unauthorized use of the taxicab they would have at least patted him down and it is predictable that the pistol tucked into his waistband would have been discovered. Although the court did not address this contention, it was posed and litigated and is a basis for upholding the court's decision.

I concur in the result reached by the lead opinion.

Buttler, J., joins in this opinion.

**NEWMAN, J.,** concurring in part and dissenting in part.

I dissent. I disagree with the majority's conclusion that defendant was in not custody when he made the incriminating statements and surrendered the gun to Murray. The trial court correctly found that defendant *was* in custody when he gave the incriminating statements and that, because the probation officer did not give him *Miranda* warnings, the statements should be suppressed. The trial court erred when it did not also suppress the gun.

The majority misinterprets the facts that the trial court found. It states that "defendant stopped Murray in the parking lot at Murray's office and asked to speak to him," 87 Or App 708, and that defendant "freely went to meet Murray * * * and voluntarily entered Murray's office." 87 Or App at 710. The trial court's findings of historical fact bind us. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968). The findings recite:

"Defendant's probation officer (Murray) was contacted by the City of Bend Police Department concerning defendant's suspected involvement in an armed robbery. They requested that Murray contact defendant and procure a picture of him. Murray left a message for defendant to contact him with defendant's wife and also at defendant's place of employment. Later, defendant met Murray at Murray's office."

Moreover, contrary to the majority's characterization, there was substantial reason for defendant, as a reasonable person, to believe that he was not free to leave. As the trial court found:

"Murray asked defendant if he had 'done the robbery.' The

defendant denied committing it and said he could account for his whereabouts. Murray phoned the police department. As he was talking to the dispatcher, the defendant blurted, 'I did it; I am sorry,' and handed a gun to Murray that he had under his shirt.

"After asking the police to come to his office, Murray questioned defendant about the details of the armed robbery. In response to a question defendant said, 'The clerk can I.D. me.' When asked what he did with the money, he responded, 'I gave it to some bums.' In being asked to account for his whereabouts, he admitted stealing a taxicab.

"Murray did not intend to allow defendant to leave until the police had talked to him and would have arrested him if defendant had tried to leave."

Although Murray did not tell defendant that he was not free to leave, Murray acted on his "subjective intent" not to let him leave by placing the call to the police. Furthermore, the record does *not* show that defendant, who was in Murray's presence when he called the police, did *not* know that Murray was calling them.

An additional factor that bears on whether defendant reasonably believed that he was not free to leave is his status as a probationer. As the trial court concluded:

"[Defendant] was not free to leave until the police had talked to him. He was being questioned as a suspect by a probation officer acting on behalf of the police and had appeared in response to that officer's request. As a probationer he was required to appear or be in violation of his obligation to co-operate with his probation officer. These facts are in direct contrast to the facts in *Oregon v. Mathiason,* 429 US 492, 50 L Ed 2d 714, 97 S Ct 711 (1977), in which a parolee voluntarily came to the police station at the request of a police officer who immediately informed him that he was not under arrest and was allowed to leave without hindrance."

*Mathiason,* a Fifth Amendment case, and the other cases which the majority cites are distinguishable on their facts. On the facts here, I would hold, as did the trial court, that defendant was in custody when he gave the incriminating statements. He was also in custody when he handed the gun to Murray.

Even if defendant was not entitled to *Miranda* warnings under the federal constitution, *but see Minnesota v. Murphy,* 465 US 420, 104 S Ct 1136, 79 L Ed 2d 409 (1984) (Marshall, J., dissenting), we must first look to the Oregon Constitution. The majority errs in deciding the case only under the federal constitution. *State v. Smith,* 301 Or 681, 725 P2d 894 (1986), was a *plurality* opinion, with Judge Gillette not participating. When that judge was on *this* court he wrote *State v. Kell,* 77 Or App 199, 712 P2d 827 (1986), *rev'd* 303 Or 89, 734 P2d 334 (1987), in which we held that Article I, section 12, requires *Miranda*-type warnings before custodial interrogation. After *State v. Smith, supra,* when the Oregon Supreme Court reversed *State v. Kell, supra,* on other grounds, it stated:

"A majority of this court has not been able to agree whether *Miranda*-type warnings are required under the Oregon Constitution. *State v. Smith,* 301 Or 681, 725 P2d 894 (1986).[2] We are agreed, however, that, *Miranda* questions aside, once a suspect in custody unequivocally requests to talk to a lawyer, that request must be granted and questioning should cease." 303 Or at 95.

In footnote 2, Judge Jones stated:

"In *State v. Smith,* 301 Or 681, 725 P2d 894 (1986), three members of this court, the Chief Justice and Campbell and Carson, JJ., held that no *Miranda*-type prophylactic rule was required to protect an individual's rights under the Oregon Constitution, while three members of the court, Lent, Linde and Jones, JJ., agreed that such warnings are required for persons in custody, although they disagreed when and where those warnings must be given." 303 Or at 95.

Accordingly, it has still not yet been decided by the Oregon Supreme Court whether the Oregon Constitution requires *Miranda*-type warnings if a defendant is subjected to custodial interrogation. I believe that the Oregon Constitution requires them. *See State v. Smith, supra,* 301 Or at 702 (Linde, J., dissenting). I believe that the Oregon Supreme Court will eventually rule that Article I, section 12, requires *Miranda*-type warnings if a defendant is subjected to custodial interrogation.

I would hold under Article I, section 12, that Murray subjected defendant to custodial interrogation and that the trial court properly suppressed his statements, because he did

not receive *Miranda* warnings. The trial court erred, however, when it did not also suppress the gun, which was the direct product of the custodial interrogation. *See State v. White,* 59 Or App 61, 650 P2d 184 (1982), *modified* 297 Or 302, 685 P2d 983 (1984).

The concurrence joins in the majority's *result* only by applying the inevitable discovery doctrine. It notes that defendant does not assign as error that the court did not suppress his statement that he stole a taxicab, that the police arrested him for unauthorized use of it and that he then took the police to the stolen vehicle before they lodged him in jail. The concurrence states that the guns "would have inevitably been discovered in defendant's possession when he was arrested." 87 Or App at 715.

Although the concurrence refers to *State v. Miller,* 300 Or 203, 709 P2d 225 (1985), that case deserves more careful attention. There, the court discussed what the state must establish if the court is to apply the inevitable discovery doctrine:

"We are persuaded that the doctrine of inevitable discovery emcompasses a two-part test. The prosecution must establish by a preponderance of the evidence: (1) that certain proper and predictable investigatory procedures would have been utilized in the instant case, and (2) that those procedures inevitably would have resulted in the discovery of the evidence in question. *See* LaCount and Girese, *The 'Inevitable Discovery' Rule,* 40 Albany L Rev 483, 491 (1976); 3 LaFave, [Search and Seizures] § 11.4 [1978 & Supp 1985].

'Clearly, the two requisites of the doctrine are linked; however, the major thrust of each can be separated. When considering the actual police procedures the court is inquiring into whether or not alternative action would have been taken by the people involved. The second aspect deals with the probability of success of the alternative action and takes into account factors outside the control of the investigators.' LaCount, *supra,* 40 Albany L Rev at 502.

"The precision with which the probability of discovery must be shown will vary with the circumstances. When the evidence is well concealed or time is a critical factor, the state will have to make a more exact showing of how or when the discovery would have occurred. In the case of a warrantless entry into premises, the two-part test would require consideration

of the possibility that, if police had not made the illegal entry into the premises, evidence might have been disposed of or hidden. *See* Note, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules,* 74 Colum L Rev 88, 97 (1974). The findings used to substantiate this two-part test must be fairly supported by the record." 300 Or at 226.

The court concluded that the findings of fact of the trial court were "fairly supported by the record." 300 Or at 227. *See State v. Hacker,* 51 Or App 743, 627 P2d 11 (1981), which also suggests that the record must support application of the inevitable discovery doctrine.

The court made no finding of fact that the police would inevitably have discovered the gun. Moreover, the record does not support application of the inevitable discovery doctrine. The concurrence suggests that it is applicable, because it is "common knowledge that persons are searched when arrested and taken into custody and before being lodged in jail." 87 Or App at 715-16. That is not sufficient. The state did not introduce evidence to meet the two-part test of *State v. Miller, supra.* In particular, there is no evidence in the record (1) that defendant was searched when the police arrested him or before the trip to where the taxicab was hidden or, indeed, before he was lodged in jail, or (2) that had he not given the gun to Murray, he lacked a reasonable opportunity to dispose of it before he was lodged in jail.

Although I concur in the majority's opinion with respect to defendant's second and third assignments of error, I would reverse and remand for a new trial, because the court should have suppressed the gun, and its admission was prejudicial.

Joseph, C. J., and Warden, J., join in this opinion.